This is a bill to foreclose a mortgage given by Mary Freedman et vir et al. to the complainant to secure the payment of the sum of fifteen thousand dollars ($15,000) in one year from the date thereof, which was September 1st, 1922.
The mortgage was in due form, and is past due and unpaid; no objection is or can be made to a decree in favor of the complainants.
By order dated May 9th, 1924, it was referred to John B. Slack, Esq., one of the masters of this court, "to ascertain and report the amount due to the complainant for principal and interest upon the mortgage held by him upon the premises mentioned and described in the bill of complaint, and also the amount due, if anything, to the said Harry Abel, Atlantic Mortgage Company, Atlantic Safe Deposit and Trust Company, A.J. Bozarth Mill and Lumber Company, Somers Lumber Company, Hudson Cement and Supply Company and Abram Gardner, upon their respective mortgages and encumbrances and to report accordingly; and also to ascertain and report the order and priority of the said several mortgages and encumbrances respectively, and whether they all embrace the same premises, and whether the premises should be sold together or in parcels, and, if in parcels, in what order; and that the said master do make his report with all convenient speed."
The master, after several sittings and the taking of several hundred folios of testimony, filed his report, in which he reported the amounts due and the order of priority of the complainants and the several defendants as follows:
"First. To the complainant on its bond and mortgage markedExhibits C-4 and C-5, the sum of sixteen thousand two hundred and forty-two dollars and fifty cents [$16,242.50], with interest from July 18th, 1924, and his taxed costs.
"Second. To the defendants Mary Freedman and Louis Freedman, her husband, and Sylvia L. Press, on their bond and mortgage marked Exhibits D-1 and D-2, the sum of nine *Page 457 
thousand six hundred and sixty dollars [$9,660], with interest, from July 18th, 1924, and their taxed costs.
"The balance of the money should then be divided among the ten separate properties in sums obtained in the following manner:
"Sum of sale price of all ten properties designated by A' less [amount due complainant plus amount due Freedman et al. as aforesaid] designated by B'.
"Sale price of property described [1] designated by C'.
"Sale price of property described [2] designated by D'.
"Sale price of property described [3] designated by E'.
"Sale price of property described [4] designated by F'.
"Sale price of property described [5] designated by G'.
"Sale price of property described [6] designated by H'.
"Sale price of property described [7] designated by I'.
"Sale price of property described [8] designated by J'.
"Sale price of property described [9] designated by K'.
"Sale price of property described [10] designated by L'.
"Amounts to be credited to each of the ten properties heretofore specifically described:
"[1] C'-A' x B'; [2] D'-A' x B'; [3] E'-A' x B'; [4] F'-A' x B'; [5] G'-A' x B'; [6] H'-A' x B'; [7] I'-A' x B'; [8] J'-A' x B'; [9] K'-A' x B'; [10] L'-A' x B'.
"After determining the amounts to be credited to each property as aforesaid, there should be paid to defendant Harry Abel from the amount credited to each of the properties [1], [2] and [3] the sum of $75.60, with interest from July 18th, 1924, and his taxed costs, and from the amount credited to each of the properties [4], [5], [6], [7], [8], [9] and [10] the sum of $36.12, with interest from July 18th, 1924, and his taxed costs.
"There should then be paid from the amount credited to property [1] to the defendant Atlantic Safe Deposit and Trust Company the sum of $12,046.25, with interest from July 18th, 1924, and its taxed costs, and if any balance remain it should be put in a fund called the general fund.
"There should be paid from the amount credited to property *Page 458 
[2] to the defendant Atlantic Safe Deposit and Trust Company the sum of $10,475, with interest from July 18th, 1924, and its taxed costs, and if any balance remain it should be put in said general fund.
"There should be paid from the amount credited to property [3] to the defendant Atlantic Safe Deposit and Trust Company the sum of $10,475, with interest from July 18th, 1924, and its taxed costs, if any balance remain it should be put in said general fund.
"There should be paid from the amounts credited to each of the properties [4], [5], [6], [7], [8], [9] and [10] to the defendant Atlantic Mortgage Company the sum of $4,792.50 against each property, with interest from July 18th, 1924, and its taxed costs, and if any balance it should be put in said general fund.
"From the general fund there should be paid without preference to defendant A.J. Bozarth Mill and Lumber Company $4,168.97, with interest from July 18th, 1924, and its taxed costs; to defendant Hudson Cement and Supply Company $1,182.06, with interest from July 18th, 1924, and its taxed costs; to defendant Somers Lumber Company $2,181.62, with interest from July 18th, 1924, and its taxed costs; to the defendant Abram Gardner the sum of $581.51, with interest from July 18th, 1924, and his taxed costs. If there is not sufficient moneys in the said general fund to pay the aforesaid defendants entitled to participate therein, to wit, A.J. Bozarth Mill and Lumber Company, Hudson Cement and Supply Company, Somers Lumber Company and Abram Gardner, then the said general fund should be divided among them pro rata."
Exceptions to the report were filed by several of the defendants.
The facts in this case are:
On September 1st, 1922, Mary Freedman and Sylvia L. Press purchased the lands and premises described in the complainant's bill of Edward Board, and as part consideration gave him a bond and mortgage (in which their respective husbands joined) to secure the payment of the sum of $15,000 *Page 459 
within one year from that date, with interest at six per cent. per annum, payable semi-annually.
The deed from and the mortgage to Board was dated September 1st, 1922, and recorded September 11th, 1922.
On February 28th, 1923, the said Mary Freedman and Sylvia L. Press, together with their husbands, conveyed the same lands and premises subject to said mortgage of $15,000 to one Martin A. Miller by deed bearing that date, and recorded on April 30th, 1923. On the day of said conveyance, and as a part of the consideration thereof, the said Martin A. Miller executed a mortgage to the said Mary Freedman and Louis Freedman, her husband, and said Sylvia L. Press to secure the payment of the sum of $9,000 on or before the 1st day of September, 1923, with interest at the rate of six per cent. per annum, payable semi-annually, which mortgage was recorded on April 30th, 1923.
On June 18th, 1923, the said Martin A. Miller made and executed a bond and mortgage to one Louis Bloom upon lot No. 1 of a map of the said lands and premises described in the complainant's bill, together with a right of way over tract No. 11, which map or sketch is hereto attached, to secure the payment of the sum of $11,500 on or before three years from the date thereof, together with interest, c., which mortgage was recorded on the same day.
On the same day a like mortgage in like amount was executed by Miller to Bloom upon lot No. 2 of said sketch, together with the same right of way. This mortgage was likewise recorded on said date.
On the same day a like mortgage in like amount was executed by Miller to Bloom upon lot No. 3 of said sketch, together with the same right of way. This mortgage was likewise recorded on said date.
On July 3d 1923, by assignment bearing that date and recorded on July 5th, 1923, the said Louis Bloom assigned to the Atlantic Safe Deposit and Trust Company the said three mortgages as security for payment of a certain promissory note in the sum of $25,000, dated July 3d 1923, payable three months after date, or any renewal thereof. *Page 460 
On June 18th, 1923, the said Martin A. Miller made and executed a bond and mortgage to one Louis Bloom to secure payment of the sum of $4,500 on or before three years from the date thereof, together with interest upon the lands and premises marked lot No. 4 of the attached sketch, together with right of way over tracts Nos. 11 and 12, excepting, however, all the lands over which part of buildings project as per map therein referred to, which mortgage was recorded on the same day.
On the same day a like mortgage in like amount was executedby Miller to Bloom upon Lot No. 5 of said sketch, together with the same rights of way. This mortgage was likewise recorded on its date.
On the same day a like mortgage in like amount was executed by Miller to Bloom upon lot No. 5 of said sketch, together with the same rights of way. This mortgage was likewise recorded on its date.
On the same day a like mortgage in like amount was executed by Miller to Bloom upon lot No. 7 of said sketch, together with the same rights of way. This mortgage was likewise recorded on its date.
On the same day a like mortgage in like amount was executed by Miller to Bloom upon lot No. 8 of said sketch, together with the same rights of way. This mortgage was likewise recorded on its date.
On the same day a like mortgage in like amount was executed by Miller to Bloom upon lot No. 9 of said sketch, together with the same rights of way. This mortgage was likewise recorded on its date.
On the same day a like mortgage in like amount was executed by Miller to Bloom upon lot No. 10 of said sketch, together with the same rights of way. This mortgage was likewise recorded on its date.
On July 3d 1923, by assignment bearing date that day and recorded on July 5th, 1923, the said Louis Bloom assigned to the Atlantic Mortgage Company, a corporation of New Jersey, for the expressed consideration of $28,350 the said seven mortgages. *Page 461 
By agreement the time of the payment of the seven mortgages last above referred to was shortened, and they were each made payable on January 3d 1924.
The lands and premises in question were conveyed by Martin A. Miller to Laura Singer by deed dated June 19th, 1923, and recorded July 30th, 1923. The expressed consideration was $1,000 and other good and valuable consideration, and in said deed it was recited, "subject, however, to two mortgages amounting in the aggregate to $24,000."
The said lands and premises were conveyed by Laura Singer and Samuel, her husband, to Samuel Levin, by deed dated September 10th, 1923, and recorded on September 11th, 1923. The expressed consideration was $3,530, and the conveyance was made "subject to all encumbrances and existing liens."
On September 22d 1923, A.J. Bozarth Mill and Lumber Company filed a mechanics' lien claim against Bloom Corporation as builder and Martin A. Miller, Laura Singer, Samuel Singer and Samuel Levin as owner for the sum of $3,869.47.
The lands described were the premises in question, and the buildings consisted of ten brick and frame stores and dwelling-houses.
On October 6th, 1923, the Somers Lumber Company filed a mechanics' lien claim against Bloom Corporation, builder, and Samuel Levin, owner, for the sum of $2,004.78. The lands described were the premises in question.
On October 8th, 1923, Harry Abel filed a mechanics' lien claim against Bloom Corporation, builder, and Samuel Levin, owner, and the Atlantic Safe Deposit and Trust Company and the Atlantic Mortgage Company, mortgagees, for the sum of $411. The lands described were the premises in question.
On October 13th, 1923, the Hudson Cement and Supply Company filed a mechanics' lien claim against the Bloom Corporation, builder, and Samuel Levin, owner, for $1,067.29.
The lands described were the premises in question, and the buildings were described as a three (3) story brick stores and apartments along Atlantic avenue at Metropolitan avenue, measuring, approximately, 16 x 40 feet, and seven (7) two-story *Page 462 
brick buildings on Metropolitan avenue, measuring, approximately, 15 x 40 feet.
On November 5th, 1923, Abram Gardner filed a mechanics' lien claim against the Bloom Corporation, builder, and Samuel Levin, owner, for $504.70.
The lands described were the premises in question, and the buildings were described as three (3) three-story brick stores and apartments along Atlantic avenue and Metropolitan avenue, measuring, approximately, 16 x 40 feet, and seven (7) two-story buildings on Metropolitan avenue, measuring, approximately, 15 x 40 feet.
On March 29th, 1923, the Bloom Corporation by one Kemors, designated as superintendent, made application to the building department for a permit to erect at Metropolitan and Atlantic avenues seven (7) two-story brick buildings 14' x 37', and three (3) three-story brick stores 14' 4" x 38', and as a part of said application is a sketch showing the premises substantially as per sketch attached hereto, excepting, however, the rights of way.
The application is endorsed: "Permit No. 16240," showing that a permit was granted for this work.
The master reported the mortgages held by the Atlantic Safe Deposit and Trust Company and by the Atlantic Mortgage Company to be prior to the mechanics' lien claims filed by the several defendants, excepting, the claimant Harry Abel, and entitled to priority of payment thereto.
There can be no dispute that the entire tract of land was originally considered as one tract, forty-three feet on Atlantic avenue by one hundred and fifty feet in depth, nor can it be doubted that at least from March 29th, 1923, the date of the affidavit to the application for a permit to build, the premises were considered by the owners as ten separate lots, upon which ten buildings were to be erected.
The three buildings on Atlantic avenue are enclosed by outside walls projected from one to two feet above the roof; between each two of the houses there is a party wall through which the division lines coincide closely, if not exactly, with the centre lines of said walls. These party walls project *Page 463 
about six inches above the roof. The situation is similar in the seven houses on Metropolitan avenue.
None of the mechanics' liens, saving that of Abel, apportioned the charges or claims to the respective tracts.
It is evident that at least two buildings were erected entirely separate and distinct from each other, and at least six feet apart.
It is also quite evident that the structure on Atlantic avenue could be considered as three buildings, while, as regards its exterior walls, it was one building; it was in every other sense divided into three separate buildings, and, likewise, the structure on Metropolitan avenue could be considered as seven separate buildings.
"The word `building' connotes normally matters of construction." Fortesque v. Carroll, 76 N.J. Eq. 583.
The first section of "An act to secure to mechanics and others payment for their labor and materials in erecting any building" (Revision of 1898), chapter 226, laws 1898, paragraph 538, provides: "Every building hereinafter erected or built within this state shall be liable, * * * which debt shall be a lien on such building and on the land whereon it stands, including the lot or curtilage whereon the same is erected," and is in the same words as recited by the chancellor in Morris County Bank v.Rockaway Amusement Co., 16 N.J. Eq. 150, and which he held (atp. 161), "a claim filed upon separate buildings and upon distinct lots of land, without apportioning the claim and designating specifically the amount claimed upon each, is not a compliance with the statute, and must be postponed to the claims of other encumbrancers. The case does not call for the decision of the question, whether the lien would have been valid if all these buildings had been upon the same tract, and no decisive opinion is intended to be expressed upon that point. It was stated, upon the argument, that that question has been passed upon by the chief-justice and other justices of the supreme court at the circuits. I apprehend it will be found that those decisions apply only to the cases where the buildings are within the same curtilage, and mere appurtenances of the *Page 464 
main building, so that a lien upon the main building would of necessity include the others. But I purpose hazarding no opinion which may conflict with any deliberately expressed opinion of the justices of the supreme court, regarding it as highly important that, upon the construction of a statute so widely operative, practitioners should not be embarrassed, and the rights of parties prejudiced by conflicting judicial opinions."
Mr. Luce, in his N.J. Mech. Lien L. (3d ed.) 1923 (at p.230), says:
"If a lien claim fails to make the necessary apportionment, and to designate specifically the amount claimed on each building, it will constitute no encumbrance on the premises. Morris CountyBank v. Rockaway, c., Co., 16 N.J. Eq. 150. But such a defect may be amended at any time before judgment. James v. Van Horn,39 N.J. Law 353; and see § 19, supra. But, if not amended, the judgment would be subject to collateral attack. Morris CountyBank v. Rockaway, c., Co., supra.
"It was questioned, in the case last cited, whether such a lien claim would be valid, in case all the buildings are on the same tract; but, as all buildings were, in fact, on different tracts, no opinion was expressed on the question adverted to, although it was intimated by the Chancellor [Green] that such a claim would be bad, unless the buildings upon the same tract were within the same curtilage and mere appurtenances of a main building.
"Where several buildings (such as a row of apartments or tenements) are erected for a single owner upon what is really a single plot of land, it may be questionable whether there is any need of an apportionment at all. As this is a question likely to be presented frequently in practice, the writer ventures the advice that the only safe course is to make such apportionment whenever it is possible to do so, since each such tenement is capable of being separately conveyed or encumbered, and, therefore, the owner is entitled to have the claim apportioned so as to preserve to him the valuable right, freely to deal with his property as several parcels, if he chooses. It may not be entirely correct, but it may be practically so, to say that the possibility of allotting a definite curtilage to each tenement will determine the necessity of making an apportionment. By this test a four-story building with an apartment on each floor is indivisible, but a row of tenements is not. A building may be divided by a vertical, but not by a horizontal, plane, for the purpose of such apportionment."
The facts in Johnson v. Algor, 65 N.J. Law 363, upon which, apparently, Mr. Luce bases his advice just cited, were that a *Page 465 
mechanics' lien was claimed "upon a certain continuous row of brick dwelling-houses, one hundred and ninety-three feet eight inches long, in front and rear, and thirty-six feet deep, situate on the south side of Elm street, between Seventh and Eighth streets, in the city and county of Camden and State of New Jersey, divided by party walls into sixteen dwelling-houses, having a front or width on Elm street varying from eleven feet eleven and a half inches to thirteen feet three and a half inches each, by a depth of thirty-six feet, and two stories high, and numbered, respectively, Nos. 706, 708, 710, 712, 714, 716, 718, 720, 722, 724, 726, 728, 730, 732, 734 and 736, and upon the lot or curtilage whereon the said row of buildings is erected," * * * "and upon each of which said buildings and the lot or curtilage whereon the same is erected," * * * "a building lien was claimed for $46.41."
"Only one summons was issued and one declaration filed, and sixteen separate judgments were asked for. Judgment was subsequently entered by default against the builder, Algor, for the whole amount of the claim. Pleas were filed by the other defendants. Burleigh pleaded, first, the general issue, and second, the statutory plea of no lien. Armstrong, the mortgagee, filed, first, a plea of the general issue; second, the statutory plea, and third, that the lien of the plaintiffs, if any, is subject to the lien of the defendant's mortgages set out and mentioned in the plaintiffs' declaration. The Security Trust and Safe Deposit Company filed pleas of the same character as those filed by Armstrong. Of the sixteen lots on which buildings were erected Armstrong held mortgages on thirteen, and the Security Trust and Safe Deposit Company's mortgages covered three of the sixteen lots. At the trial a nonsuit was given on the ground that one suit was brought to establish sixteen liens, when there should have been a separate suit for each house and lot of land based upon the general lien. Whereupon the judge of the circuit court certified to the supreme court for its advisory opinion the question whether the plaintiffs should have been nonsuited for bringing one suit only on their apportioned lien claim instead of sixteen separate suits." *Page 466 
"At the time the materials were furnished, one D. Leonard Moore was the owner of the land upon which these houses were being erected. On March 6th, 1894, prior to the filing of the lien claims, Moore conveyed the premises to B.F. Inman, and March 7th, 1894, Inman and wife executed sixteen mortgages of $1,000 each on each of the said houses, respectively, to Edward A. Armstrong. On the same day Inman and wife conveyed all the houses to John J. Burleigh. On March 17th, 1894, Armstrong assigned to the Security Trust and Safe Deposit Company three of the mortgages covering premises 706, 708 and 710 Elm street, respectively. A lien claim was filed on January 7th, 1895, claiming a building lien on sixteen city dwelling-houses and lots in the city of Camden, apportioning $46.41 to each house. The houses and lots are contiguous and adjoining."
The chief-justice stated: "The act provides that the suit shall be brought against the builder, and also the person who is the owner of the building and lands at the time the lien claim is filed, and further provides that every person holding a mortgage of record against the property affected by the lien claim, whose mortgage would be cut off by a sale under the lien claims, shall be made a party or parties defendant." P.L. 1884 p. 260; Gen.Stat. p. 2072 (now part of section 23 of the 1898 act). "All the mortgages in this case were subsequent to the commencement of these buildings." The second section of the act of 1884 (now part of section 24 of the 1898 act) "after providing for the mode in which mortgagees shall be summoned and the pleas to be filed by them, provides that the judgment recovered shall determine the priority of the liens of the plaintiff and of each of the mortgagees; and if the lien claim shall have priority over the mortgages, the mortgagees shall be paid out of the surplus moneys realized from the sale after paying all concurrent liens. Where the lien claim covers a number of buildings and the lots on which they are erected, and each lot is encumbered by a subsequent mortgage, the holder of such a mortgage is interested only in the determination of the amount that shall be due to the plaintiff on his lien claim on *Page 467 
the particular lot upon which he holds his mortgage. So, also, where the property consists of lots whereon separate buildings have been erected, and the ownership of lots has changed since the buildings were commenced, the person who is the owner when the lien claim was filed is interested only in the litigation with respect to the lien on his own property. To meet the contingencies that may arise in this way the legislature, by an act passed in 1873, provided "that whenever any person or persons shall hereafter furnish any materials or perform any labor for the erection or construction of two or more buildings, where such buildings are built and constructed by the same person or persons, it shall be lawful for the person or persons so furnishing such materials or performing such labor to divide and apportion the same among the said buildings in proportion to the value of the materials furnished to or labor performed for each of said buildings, and to file with his, her or their lien claim therefor a statement of the amount so apportioned to each building in lieu of the bill of particulars required by the eleventh section of this act, which said lien claim, when sofiled, may be enforced under the provisions of this act in thesame manner as if said materials had been furnished and laborperformed for each of said buildings separately," c. P.L. 1873p. 71; Gen. Stat. p. 2066 § 17 "(now section 22 of the 1898 act)," and held that the plaintiffs were properly nonsuited, unless the infirmities could be cured by amendment.
It certainly follows that, if it had not been necessary to apportion, a plaintiff could not be nonsuited for not filing separate declarations after attempted apportionment.
That an apportionment is necessary in like cases is implied inCrane v. Brighton Mills, 98 N.J. Law 308: "The proofs show that the Brighton Mills Company was the owner of a tract of land; * * * that it made a contract with the Berridge Company to erect twelve frame buildings upon this tract."
It was urged, as a reason for reversal, "that as the materials had been furnished for use in twelve different buildings, the plaintiff was bound to show a pro rata distribution *Page 468 
of his lien claim among the various buildings embraced in it, and that the distribution was based upon the apportionment of the deliveries among the houses covered thereby."
The chief-justice said: "The motion, we think, was properly denied, so far as this contention is concerned. The lien claim was offered in evidence, and that showed an equal distribution of the whole claim among the twelve houses which were being constructed on the Allwood tract, and there was proof, in addition, that these twelve houses were substantially alike in construction. These two pieces of testimony, taken together, made it a question of fact to be determined by the jury, whether or not there was an equitable distribution of the plaintiff's claim among the twelve buildings for which the materials were furnished."
Assuredly, this language would not have been used unless it was necessary to prove an apportionment as having been made.
It follows that an apportionment was necessary in the situation presented by the facts existing in this case, and the master was correct in reporting the mortgages held by the Atlantic Safe Deposit and Trust Company and the Atlantic Mortgage Company were prior to the mechanics' lien claims filed, in which no apportionment had been made.
The exceptions to the master's report are overruled, and the said report is confirmed.
Copy of map annexed to the original omitted. *Page 469